In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1167

CHICAGO TEACHERS UNION, TERRI
FELLS, LILLIAN EDMONDS, and
JOSEPHINE PERRY, Individually and on
Behalf of all Similarly
Situated Persons,

*Plaintiffs-Appellants*,

*v.*

BOARD OF EDUCATION OF THE CITY OF
CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 10338 — **Jorge L. Alonso**, *Judge.*

ARGUED SEPTEMBER 15, 2020 — DECIDED SEPTEMBER 22, 2021

Before FLAUM, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Citing an alleged budget deficit, the Board of Education of the City of Chicago ("the Board") laid off approximately 1,077 teachers and 393 paraprofessional educators in the summer of 2011. The Chicago Teachers Union and a class of teachers (collectively "CTU") filed suit against the Board alleging that the layoffs discriminated against African American teachers and paraprofessionals in violation of Title VII of the Civil Rights Acts of 1964 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* The district court granted summary judgment in favor of the Board on the parties' cross-motions for summary judgment. CTU appeals, but we affirm.

## I.

During the 2010-2011 school year, the Board concluded that it would need to eliminate certain teaching and paraprofessional positions for the upcoming 2011-2012 school year. This conclusion was based on a significant projected budget deficit for the upcoming 2011-2012 school year as well as declining enrollment in a number of Chicago public schools. Senior members of the Board met several times in May 2011 to consider options for reducing the proposed budget deficit. Ultimately, the Board instituted a series of spending cuts—$107 million in Central Office spending, $27 million in operations, and $86.7 million in program reductions.

Most relevant here, however, was the Board's decision to close 1,077 teaching and 393 paraprofessional (1,470 total) positions for the upcoming school year based on declining enrollment at certain Chicago Public School ("CPS") schools. In the 2010-2011 school year, the Chicago school district was divided into 29 geographic "Areas." The majority of African

American students attended schools corresponding geographically to the south and west sides of Chicago, which were also the schools with declining enrollment. Specifically, in the decade leading up to the 2010-2011 school year, the number of students enrolled in CPS schools dropped by 7.7% overall—from 437,618 to 404,151—but the number of African American students declined by 25.2%—from 224,494 to 168,020. These declining enrollment numbers loosely correlated with census data showing that the population of African Americans in the City of Chicago declined from 1,065,009 to 887,608 (16.7%) from 2000 to 2010.

As it had in past years, the Board decided which positions to eliminate and which CPS employees to lay off based on projected enrollment numbers. The Board laid off faculty and staff from three types of positions: 1) quota positions; 2) instructional or programmatic positions; and 3) discretionary fund positions. Quota positions are allocated to each school based on its student enrollment. Instructional or programmatic positions, which covered specialized curriculum such as bilingual education, were also staffed based on projected enrollment. Finally, discretionary fund positions, which were based on federal Title I appropriations and supplemental general state aid appropriations from the Illinois State Board of Education, were tied to the number of students eligible for free or reduced lunch, a number that dropped with declining enrollment.

To reach its decisions about layoffs, the Board worked with the Office of Management and Budget to determine which quota positions would be eliminated per school using a formula based on projected enrollment. Like the quota

positions, programmatic and instructional positions as well as discretionary funds for positions were eliminated using enrollment projections. Using 2011-2012 enrollment projections provided by the Demographics Department, the Office of Management and Budget created and disseminated a packet to each principal explaining its budgeting process. Principals also received a letter setting forth the number of quota, instructional, and programmatic positions allowed as well as the total discretionary funding allocated. If these numbers required fewer positions than the previous year, the principal then decided which positions to eliminate. This decision was based on the principal's own assessments as well as seniority and certification criteria set forth in the collective bargaining agreement ("CBA").

Before the 2011 layoffs, the Board employed approximately 27,240 Union members. Approximately 8,048 of these employees were African American, or roughly 30%. Around 1,470 Union members received layoff notices, and over 600 of those members were African American. Thus, although African American teachers or paraprofessionals comprised only 30% of total teachers or paraprofessionals, they made up over 40% of those who received layoff notices. Many of these individuals worked at the South and West side schools where enrollment had declined most sharply.

Under the CBA, teachers and staff receiving layoff notices received full pay and benefits through August 31, 2011. Some tenured teachers were transferred to the Reassigned Teachers Pool, where they received full salary and benefits for ten months while working as substitute teachers. Others were offered lower-paying substitute positions on a day-to-day

basis. Of the 630 African American individuals who received layoff notices, 335 had found full-time positions with the Board by September 1, 2011 and therefore suffered no loss of pay or benefits. Another thirty-four voluntarily retired before September 1, 2011.

In December 2012, appellants filed suit against the Board, alleging that the 2011 layoff decisions disparately impacted African American teachers and staff in violation of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991. 42 U.S.C. § 2000e *et seq.* The individual plaintiffs, Terri Fells, Lillian Edmonds, and Josephine Hamilton Perry, are African Americans who were working as teachers in CPS schools when they received layoff notices in the summer of 2011. In May 2015, the district court certified the class, which it ultimately defined over the Board's objection as follows:

> All African American persons employed as a tenured teacher or staff member, as defined by the collective bargaining agreement between the Chicago Teachers Union and the Board of Education of the City of Chicago, who received a layoff notice from the Board of Education pursuant to its "layoff policy in 2011."

Dkt. 165, p. 2.

The plaintiffs later amended their complaint to add a Title VII disparate treatment claim against the Board. After considerable back and forth, including the Board's unsuccessful attempt to add a counterclaim with its affirmative defenses, the parties filed cross-motions for summary

judgment along with *Daubert* motions to exclude the other party's expert testimony.

The district court granted summary judgment in favor of the Board, and denied as moot both the motion to exclude the Board's expert, Dr. David Blanchflower, and the motion to exclude CTU's expert, Dr. Jonathan Walker. Although the parties disputed the admissibility of their respective experts' reports and the question of whether there had been an adverse employment action at all (after accounting for the class members who ultimately suffered no loss of pay or benefits), the district court dismissed these issues as unnecessary to the outcome. Ultimately, the district court concluded that the class had failed to rebut the Board's legitimate business justification for the layoffs. Specifically, the court assumed that the report of CTU's expert, Dr. Walker, showing a statistically significant disparate impact on African American employees, was admissible, and that the report submitted by the Board's expert, Dr. Blanchflower, drawing a different conclusion was not. Nonetheless, the court concluded that the Board had demonstrated that tying the layoffs to declining enrollment was consistent with business necessity, and that CTU failed to provide evidence that the Board could have accomplished the same business objective in an equally efficient and less discriminatory way.

The court also relied on the business justification offered by the Board to conclude that CTU's disparate treatment claim failed on the merits. The district court thus sidestepped an argument between the parties as to whether the disparate treatment claim had been exhausted, given that CTU had not explicitly raised it in its Equal Employment Opportunity

Commission (EEOC) charge. The district court thus granted summary judgment to the Board on all of CTU's claims.

## II.

CTU appeals, arguing that it has presented sufficient evidence to withstand summary judgment on both its disparate impact and disparate treatment claims. We review the district court's judgment on cross motions for summary judgment de novo, drawing all reasonable inferences in favor of "the party against whom the motion at issue was made." *Woodring v. Jackson Cty. Ind.*, 986 F.3d 979, 984 (7th Cir. 2021) (quotations and internal citation omitted). Summary judgment is appropriate only when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The primary prohibition on discrimination in Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to fire or "otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or "limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of race. 42 U.S.C. § 2000e(2)(a)(1)-(2). In addition to the express prohibition against intentional discrimination in § 2000e(2), the Supreme Court has long recognized that Title VII also prohibits "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971); *see also Ricci v. DeStefano*, 557 U.S.

557, 576–78 (2009) (recognizing prohibition on facially neutral practices that discriminate in operation). This prohibition on employment practices with a disparate impact was later codified in the Civil Rights Act of 1991. 105 Stat. 1071 (codified at 42 U.S.C. § 1981(a) *et seq.*); *see also Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016) ("Title VII prohibits employment practices that have a disproportionately adverse impact on employees with protected characteristics, even if the impact is unintended.").

We begin with CTU's disparate impact claim. A plaintiff establishes a prima facie violation of the disparate impact statute by demonstrating that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). To meet this burden, plaintiffs must produce evidence that an employment practice results in "'observed statistical disparities,'" as well as establish causation with "'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). A defendant must then establish "that its method is job-related and consistent with business necessity." *Price v. City of Chicago*, 251 F.3d 656, 659 (7th Cir. 2001); *see also Albermarle Paper Co. v. Moody*, 422 U.S. 405 (1975); *Griggs*, 401 U.S. at 431. The burden then shifts back to the plaintiff to show that the employer refused to use an available yet equally valid and less discriminatory practice. *See Puffer*, 675 F.3d at 717; 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

Neither party takes issue with the district court's assumption that plaintiffs made a prima facie case of disparate impact with the evidence that African American individuals comprised approximately 30% of Union members at the time of the layoffs but made up just over 40% of Union members receiving layoff notices. Nor do they challenge the court's finding that the Board's decision to tie layoffs to declining enrollment in schools was legitimate, job-related, and consistent with business necessity.

Thus, the sole disputed issue on appeal regarding the disparate impact claim is whether CTU met its burden of establishing that the Board had an equally efficient and less discriminatory way to conduct the 2011 layoffs. In the district court, CTU offered several alternatives it asserted the Board could have pursued: (1) transferring class members to open positions; (2) conducting an adverse impact analysis preceding the layoffs; (3) avoiding the use of enrollment projections to determine layoffs; or (4) using other sources of funding instead of laying off employees. On appeal, CTU reasserts its claim that class members could have been transferred instead of receiving layoff notices, and also argues that the district court erred by failing to consider all of its proposed alternatives together instead of each one in isolation.

To support its assertion that the Board could have avoided layoffs by transferring employees to open positions, CTU uses the Board's own evidence from the district court. The Board argued in opposition to summary judgment that after taking into account that over half of the teachers receiving layoff notices had no loss of pay and benefits and had secured equivalent jobs by September 1, 2011, CTU could not

demonstrate that a statistically significant number of African American employees had suffered an adverse employment action. The district court, however, assumed for purposes of summary judgment that the layoff notices themselves constituted an adverse employment action, and the Board has not challenged that assumption on appeal. But CTU now seizes on the Board's evidence that many of the employees quickly found comparable jobs to advance its claim that the Board could have avoided the discriminatory effect of the layoff notices by transferring employees to what were clearly—as the Board's evidence itself demonstrates—available positions.

However, beyond noting the existence of open positions for which laid off employees were qualified, CTU does little to meet its burden that its proposed alternative was "available, equally valid and less discriminatory." *See Allen v. City of Chicago*, 351 F.3d 306, 312 (7th Cir. 2003). Contrary to CTU's assertion, the mere fact that over half of the employees were ultimately able to move into other open positions does little to satisfy its burden "to demonstrate a viable alternative and give the employer an opportunity to adopt it." *Id.* at 313 (citing 42 U.S.C. § 2000e-2(k)(1)(A)).

CTU's failure to provide any concrete detail as to how such a transfer plan would have operated is compounded by two additional reasons the Board identifies. First, the Illinois School Code places hiring discretion with principals, not the Board. On this point, both parties cite to 105 ILCS 5/34-8.1, which provides in relevant part that vacant positions "shall be filled by appointment *made by the principal* in accordance with procedures *established and provided by the Board*." (Emphasis added.) The Board points out that by statute, vacancies must

be filled "by the principal." CTU responds by focusing on the language vesting ultimate authority with the Board to establish and provide procedures for filling vacant positions. Given the Board's final authority over hiring procedures, CTU may be correct that the Illinois code does not *forbid* the kind of transfer arrangement they now propose. It does, however, clearly vest hiring authority with school principals and not the Board itself. Without more evidence as to *how* the Board could have simply overridden the existing system, CTU has failed to carry its burden of demonstrating a "viable" alternative that the Board refused to adopt. *See Adams v. City of Chicago*, 469 F.3d 609, 616 (7th Cir. 2006). Given this, CTU's claim that the Illinois School Code encourages discrimination if it bars the Board from unilaterally transferring employees goes nowhere. As the Board recognizes, the statute's designation of hiring discretion to principals neither promotes discrimination nor bears any relationship to the Board's decision to tie layoffs to declining enrollment, which it has already shown to be based on a legitimate business necessity.

The transfer alternative proposed by CTU is also not consistent with the CBA, which sets forth procedures for handling teacher and paraprofessional layoffs and reassignments when there is a "drop in enrollment." Specifically, the portions of the CBA dealing with drops in enrollment and reassigned teachers in the teachers' pool both confirm that school principals retain decisionmaking authority over permanent hiring within their schools. The CBA thus reinforces the Illinois School Code with language that both the Union and the Board agreed to specifying that tenured teachers in the reassigned teachers' pool could be transferred to an

interim position for up to 60 days but that the principal had the final authority as to whether such teachers could become permanent employees. CTU's failure to explain how its proposed transfer solution could be enacted consistent with the CBA is yet another reason CTU has failed to meet its burden to demonstrate an existing, viable alternative to the Board's enrollment-based layoffs.

CTU also suggests for the first time on appeal that the district court erred by failing to consider all of its proposed less discriminatory alternatives together. Not only did CTU fail to develop this argument in the district court, here again it provides no detail as to *how* the Board would have enacted such a combination of ideas. As described above, CTU also claims that in addition to transferring employees to other open positions, the Board could have (1) conducted an adverse impact analysis before moving forward with layoffs; (2) relied on factors other than enrollment to select employees for layoff; and (3) relied on "other sources" of funding or revenue to avoid layoffs altogether. But for each proposed alternative, CTU falls far short of providing the sort of detail necessary to meet its burden of establishing an alternative to the Board's system: it fails to spell out *what* factors other than enrollment should have been used; fails to explain precisely *how* the Board could have accessed "other sources" of funding or how that funding would have allowed it to keep teaching positions open in schools with declining enrollments; and fails to identify how conducting an adverse impact study would obviate the need to base layoffs on declining enrollment. Thus, the district court correctly concluded that CTU did not carry its burden of establishing an equally valid, less discriminatory alternative

the Board could have used in lieu of layoffs based on enrollment numbers.

That leaves only CTU's disparate treatment claim. To survive a motion for summary judgment on a Title VII claim of discriminatory discharge on account of race, the plaintiff must produce evidence to support a reasonable inference that the plaintiff's race (or other forbidden factor) caused the adverse employment action. *See, e.g.*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Board first renews its claim that CTU failed to properly exhaust its administrative remedies by failing to explicitly bring its disparate treatment claim in its EEOC charge, which referred only to its disparate impact claim. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (reiterating that Title VII plaintiff may bring only those claims that were included in or "within the scope of" the EEOC charge). The CTU responds by arguing that the Board waived this argument by failing to raise it until it moved for summary judgment. We need not resolve the parties' dispute over exhaustion and waiver however, because CTU has failed to put forth any evidence of intentional discrimination on the part of the Board.

CTU asserts that it has sufficient evidence to survive summary judgment on its disparate treatment claim because it has shown that (1) the adverse impact of the layoffs on African American employees was statistically significant, and (2) the Board knew the layoffs would primarily impact African Americans. Although helpful in establishing its disparate impact claim, the fact that CTU has shown that layoffs disparately impacted African Americans in a statistically significant way does not reasonably lead to the inference that

the Board intentionally discriminated. CTU points to nothing in the record undermining the Board's evidence that its layoff decisions were based on declining enrollment, not any intention to discriminate. Likewise, CTU fails to explain what evidence establishes that the Board knew in advance that the layoffs would disproportionately impact African American teachers and paraprofessionals.

What's more, CTU never explains how such knowledge, even if proven, would demonstrate that the Board intended to discriminate. In short, none of CTU's evidence undermines the conclusion that the Board used a race-neutral, bureaucratic mechanism to adjust staffing in Chicago public schools to meet the needs of declining enrollment and potential budget shortfalls. CTU has also failed to produce evidence that would allow a reasonable juror to conclude that the Board's layoffs were a pretext for discrimination or that the Board acted with an intent to discriminate. Summary judgment was thus appropriate for the Board on the CTU's disparate treatment claim as well as its disparate impact claim.

## III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in all respects.