# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-2406

SUPERL SEQUOIA LIMITED,

*Plaintiff-Appellant*,

*v.*

THE CARLSON COMPANY, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07-cv-640-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED JANUARY 11, 2010—DECIDED AUGUST 11, 2010

Before EASTERBROOK, *Chief Judge*, KANNE, *Circuit Judge*, and KENNELLY, *District Judge*.[†]

EASTERBROOK, *Chief Judge*. During the first half of 2007, Macy's, Inc., planned for an extensive promotion of goods under the Martha Stewart label. (At the time, Macy's was known as Federated Department Stores; we use its current corporate name.) The department-store

---

[†]  Of the Northern District of Illinois, sitting by designation.

chain invited bids for equipment and services needed to turn portions of 226 stores into settings for the promotion. Carlson Company, a furniture manufacturer based in Madison, Wisconsin, proposed to supply 4,000 "fixtures" for this project. We put the word in quotation marks because the beds, armoires, tables, and other items that Macy's wanted are not "fixtures" as the law of real property uses that term. They are pieces of furniture rather than doors, swimming pools, or durable goods expected to remain in place for years to come. We call the items furniture rather than fixtures.

Carlson did not have the capacity to make all of the furniture in time for Macy's deadline. Before placing a bid, it asked Superl Sequoia Limited, a manufacturer based in Hong Kong, whether it could meet most of Macy's requirements. Superl Sequoia said that it could, and that it would participate if Carlson was willing to split any profits 50/50. Carlson agreed. Its role would be to install the furniture so that the displays met Macy's specifications, and to fix or replace any furniture that arrived in substandard condition (or, worse, did not arrive at all). In February 2007 Superl Sequoia gave Carlson a quote of approximately $3.4 million, including shipping, for the items Macy's wanted. Carlson accepted the quote, applied a markup of 22% (on which Superl Sequoia and Carlson had agreed) to that quote plus Carlson's estimate of its own costs, and bid approximately $5 million to Macy's, which accepted on March 1, 2007.

The displays were installed on time (July 16, 2007). Macy's was satisfied with their quality and paid

Carlson's invoice. But the project required more work than Carlson had expected. Some of the furniture arrived from China late or not at all; Carlson had to make or buy replacements. Some of the furniture was damaged in transit, and some did not meet Macy's specifications. Again Carlson had to manufacture replacements or fix the damage. Superl Sequoia concedes that some of the 4,000 items needed to be fixed or replaced, though it thinks that Carlson did not need to spend as much as it did on replacements or fix as many pieces as it did. Carlson eventually paid Superl Sequoia about $2 million, as opposed to $3.4 million plus 50% of any profits. Superl Sequoia sued for the balance under the international-diversity jurisdiction. 28 U.S.C. §1332(a)(2). Carlson is a Wisconsin corporation with its principal place of business in Wisconsin. Superl Sequoia is a Hong Kong business organization "limited by shares," a status in the Commonwealth of Nations that we have held is equivalent to a corporation in the United States. See *Lear Corp. v. Johnson Electric Holdings Ltd.*, 353 F.3d 580, 582–83 (7th Cir. 2003).

The district court concluded that Superl Sequoia breached its contract by furnishing some defective goods and not delivering others and that Carlson could charge against the joint venture the costs of replacing or repairing the items. Superl Sequoia does not contest these conclusions. Because the parties could not agree on how many items were defective, or what Carlson's reasonable costs were, the court held a bench trial. Before trial, however, the judge concluded that Superl Sequoia's $3.4 million quote must be disregarded. Only its out-of-

pocket costs could be charged to the joint venture, the judge held. The $3.4 million bid included a markup, which must be removed. 2008 U.S. Dist. LEXIS 56167 (W.D. Wis. July 23, 2008).

At the trial, both sides provided evidence of their actual costs of performance (manufacturing and shipping on Superl Sequoia's side; delivering and assembling the displays on Carlson's). The judge then used these costs to determine how much profit the joint venture had made and divided that profit 50/50 between Superl Sequoia and Carlson. The judge concluded that Superl Sequoia's chargeable costs were $2.2 million, that Carlson's chargeable costs were $400,000, and that each side is entitled to $1.15 million as its share of profits. (We disregard some other sums that the judge deducted from the $5 million.) The judge then concluded that Carlson is entitled to about $1.16 million to cover the expense of repairing or replacing furniture. Since Carlson had already paid Superl Sequoia about $2 million, the bottom line was a net judgment of $9,550 in Carlson's favor. 2009 U.S. Dist. LEXIS 37492 (W.D. Wis. May 1, 2009).

Superl Sequoia takes issue with many of these calculations, but its arguments can't get past the standard of appellate review: a district judge's findings after a bench trial may be upset only if clearly erroneous. See Fed. R. Civ. P. 52(a)(6); *Anderson v. Bessemer City*, 470 U.S. 564 (1985). The judge did not commit any clear error in toting up costs. Many of the decisions are debatable, but it is the trier of fact, rather than an appellate court, that resolves debatable factual issues. Costs of manufac-

turing are notoriously hard to calculate, because many of a business's costs are fixed in the short run. Tools and machines can be used for many projects, and the allocation of these expenses to any one project depends on the elasticity of demand for the different outputs, which can be hard to determine. It is enough to say that the district judge's handling of the disputes about the amount and allocation of costs is thoughtful and reasonable.

By contrast, appellate review of legal issues, including the meaning of contractual language that need not be disambiguated by parol evidence, is plenary. See *PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 971 (7th Cir. 1994). The district judge made two legal decisions that had a significant effect on the calculations. One, which we have mentioned already, is that Superl Sequoia cannot treat its quotation as the cost of making and shipping the furniture but is limited to out-of-pocket expenses, free of any markup for overhead, the cost of capital, or a reserve for risk. (The judge made this decision as a matter of law before trial; neither side has suggested that the judge should have kept the issue open until trial and received extrinsic evidence on the subject. Neither side had any to present.) The second decision is that, when calculating the cost of replacement and repair, Carlson is entitled to a markup to reflect overhead and the cost of capital. The district court treated Carlson's cost of making repairs as the fee that it would charge to strangers for equivalent work—a price that includes overhead and

profit. Unsurprisingly, Superl Sequoia sees these decisions as inconsistent and contends that one or the other must be wrong. Actually, Superl Sequoia contends that *both* are wrong. Recovery of its own overhead and reserve for risk is justified, Superl Sequoia insists, because Carlson accepted the $3.4 million quote. Carlson did not quote repair prices to Superl Sequoia and therefore is limited to out-of-pocket outlays under a cost-sharing arrangement, the argument concludes.

Evaluating these arguments is complicated by the fact that the parties operated on the basis of email exchanges, each of which contains only a few potential contractual terms, and did not memorialize their arrangement until May 7, 2007, after Macy's had accepted the $5 million bid and much of the furniture was on its way from China to the United States. Superl Sequoia made its $3.4 million quotation, which Carlson accepted, more than two months earlier, and Superl Sequoia says that this became an inviolate part of the parties' deal. Carlson contends, and the district court found, that this quotation was superseded by an email that Carlson sent to Superl Sequoia on May 7, an email to which it replied with general agreement and some emendations on May 8. The judge found that the May 8 email must be ignored because Carlson did not unequivocally agree—though this reasoning may call into question the status of the May 7 email as well, because the May 8 email may amount to a counterproposal rather than an acceptance plus a new proposal for changes. This is not a subject we need to run to ground, however.

The first two paragraphs of the May 7 email serve as the foundation for the district judge's decision to disregard the $3.4 million quotation:

> 1. The over riding theory and agreement is CC (Carlson Company) and SS (Superl Sequoia) share quoted costs (not sell price, but costs) of manufacturing 50/50 so that if there is any financial risk of non-payment, both CC and SS share that risk equally. By "sharing," we define CC pays 1/2 of SS's manufacturing costs if SS is the primary manufacturer, and vice versa if [CC] is the primary manufacturer.

> 2. There are many different scenarios that can be addressed, but neither CC or SS believe in an overly complicated agreement. The overriding principle is that both CC and SS share equally in JOINT manufacturing costs to date so we always have, within reason, the same financial exposure for costs to date. This excludes any overhead either party might have or indirect costs.

When calculating Carlson's costs, the district judge did not mention these paragraphs, which undercut the decision to permit Carlson to charge against the joint venture its "sell price" of replacements and repairs. Under these paragraphs, only Carlson's out-of-pocket costs are chargeable. The district judge must recalculate the $1.16 million figure for Carlson's repair and replacement costs.

That leaves the status of the $3.4 million quote, which is not as easy to resolve on the basis of the email's language.

Paragraph 1 shows that, if Macy's did not pay, then Superl Sequoia would get no more than $1.7 million (half of the manufacturing costs, to be paid by Carlson), and would have to compensate Carlson for half of Carlson's costs. But Macy's did pay. The question then becomes whether the $3.4 million should be treated as Superl Sequoia's costs, given that both ¶1 and ¶2 of the email say that overhead and other indirect costs are excluded.

Carlson sees the answer as easy. The quotation included overhead and a reserve for risk; these are incompatible with the May 7 email and must be removed. That was the district judge's view too. But there are two problems. First, Carlson had accepted the $3.4 million quotation more than two months before sending the May 7 email. It cannot retroactively revoke an acceptance on which Superl Sequoia relied when joining the business venture and manufacturing the furniture, much of which was already in transit when Carlson sent the May 7 email. Second, the quotation served two functions: as a floor, and as a ceiling. Superl Sequoia had agreed that if manufacturing and shipping the furniture turned out to cost more than $3.4 million, it would swallow the loss rather than charge the excess expenses to the joint venture. Carlson enjoyed that price protection but now wants to take away the compensation that Superl Sequoia was to receive for providing it.

We asked Carlson's lawyer at oral argument what would have happened if Superl Sequoia's costs had exceeded $3.4 million, perhaps because it had to ship more furniture by air than it had anticipated. (Which it

did. Superl Sequoia's final invoice to Carlson was for a little more than $3.4 million.) Counsel replied that all extra costs were Superl Sequoia's responsibility, that it could not have claimed more than $3.4 million for its role in the venture. Yet that position is incompatible with Carlson's contention that the May 7 email superseded the February price quotation. Carlson can't have things both ways. If the $3.4 million quotation survived as a cap on the expenses that Superl Sequoia could charge to the venture, it also survived as a floor. That's the nature of a firm price quotation. A cost-plus contract, which is how the district judge understood the deal, allows variation up as well as down. One can imagine a deal such as "we will make 4,000 pieces of furniture in exchange for out-of-pocket costs plus 50% of profits, but if our costs exceed $x we will bear the excess ourselves." The potential for profit might compensate for the risk of cost overruns. But that is not the nature of the February offer, which Carlson accepted, and it is hard to understand the May 7 email as retroactively changing the fundamental economic structure of Superl Sequoia's participation in the Martha Stewart project.

Paragraphs 3 and 4 of the May 7 email support this understanding. Here they are:

> 3. Using the Martha Stewart project as a guide, where SS is the primary manufacturer, SS and [CC] will agree on a manufacturing cost, order quantity and shipping/production schedule at the beginning of the project. SS will request a start up deposit and subsequently invoice [CC] for 50% of

the manufacturing cost at the time of each ship-
ment, to be paid within 3 days by [wire].

4. CC and SS will mutually trust one another with
the factual accuracy of "draws" and or expenses
to date, but either party may request satisfactory
documentation from the other if requested, and
do so in a timely fashion, and neither CC or SS
will imply or infer any offense or mistrust from
the other by that request. Wherever/whenever
possible, CC & SS will have pre-agreed manufac-
turing cost that will dictate payment amount(s).

Paragraph 3 implies that the May 7 email provides a
framework for future ventures between Carlson and
Superl Sequoia, rather than documenting the terms for
the Martha Stewart project as a one-off deal. This may
explain why the email never mentions any terms of the
Martha Stewart project. Paragraph 3 also implies that the
Martha Stewart project's contract is already set (other-
wise how could it serve "as a guide"?), which would
mean that it is not modified by the May 7 email. Para-
graphs 3 and 4 indicate that, although ¶2 requires
splitting out-of-pocket costs as a default rule, Carlson
and Superl Sequoia will try to set a "manufacturing cost . . .
at the beginning" of any project and that "pre-agreed
manufacturing cost . . . will dictate payment amount(s)." So
the May 7 email approves using price quotes, and the
February quote of $3.4 million fits comfortably as a "pre-
agreed manufacturing cost" for this purpose.

Paragraph 1 of the May 7 email means that Superl
Sequoia would have to accept less than $3.4 million, and

would have to underwrite half of Carlson's expenses, if Macy's did not pay (or did not pay enough). But ¶2 is best read as limited to the participants' incremental costs—that is, the expenses of furniture and services not already provided for in the $3.4 million. That reading avoids undercutting Superl Sequoia's legitimate reliance on Carlson's acceptance of the $3.4 million quotation and avoids turning a firm price quotation into an asymmetric deal (in which Superl Sequoia had placed a cap on its expenses, without a floor under them). The entirety of the May 7 email shows that the parties were to be treated alike; using the $3.4 million bid as a cap but not a floor would violate that symmetry. Judges endeavor to read contracts to make economic sense, see *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002); *Gottsacker v. Monnier*, 281 Wis. 2d 361, 375, 697 N.W.2d 436, 442 (2005), and it would undermine the economic structure and function of this transaction to treat the $3.4 million as a cap on Superl Sequoia's expenses, while depriving it of any floor.

The judgment of the district court is vacated, and the case is remanded with instructions to recalculate the net judgment consistently with this opinion.